***********
Upon review of the competent evidence of record, with reference to the errors assigned, and considering the briefs and oral arguments of the parties, the Full Commission finds no good grounds to receive further evidence, or to rehear the parties or their representatives. Upon reconsideration of the evidence, the Full Commission reverses the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into at the hearing as:
 STIPULATIONS *Page 2 
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At the time of the May 9, 2008 alleged injury, Defendant-Carrier provided workers' compensation insurance coverage to Defendant-Employer.
3. On May 9, 2008, Defendant-Employer employed Plaintiff as a legal assistant. Since October 21, 2002, Plaintiff had been working for Defendant-Employer.
4. On May 9, 2008, Plaintiff's average weekly wage was $1,048.03 at all times relevant to these proceedings, yielding a compensation rate of $698.72.
5. On June 12, 2008, Plaintiff filed a Form 18 with the North Carolina Industrial Commission claiming an occupational disease for injuries to her bilateral upper extremities.
6. In a Form 33R dated December 30, 2008, Defendants denied Plaintiff's workers' compensation claim for benefits.
7. Plaintiff underwent multiple surgeries on her bilateral upper extremities while employed with Defendant-Employer, including:
 a. a right lateral epicondylar release with partial ostectomy on July 3, 2003;
 b. a left triangular fibro-cartilage complex (TFCC) tear debridement on January 5, 2006;
 c. a left carpal tunnel release on July 13, 2006;
 d. a left lateral epicondylar release with partial ostectomy and left extensor carpi ulnaris decompression on May 7, 2007; and
 e. a right medial epicondylar release with partial ostectomy on January 24, 2008. *Page 3 
8. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One: Pre-Trial Agreement;
 b. Stipulated Exhibit Two: Various documents, including:
 1. North Carolina Industrial Commission forms and filings;
 2. Plaintiff's medical records;
 3. Discovery responses;
 4. "Ergonomic Work-Task Analysis" of Mr. William T. McClure, Jr. dated January 9, 2009;
 5. "Legal Assistant Duties Matrix;"
 6. "Guidelines for Legal Assistants;"
 7. Video of Ms. Roberta Hill performing duties of legal assistant for Defendant-Employer;
 c. Stipulated Exhibit Three: "Explanation of Long Term Disability Benefits" forms;
 d. Defendants' Exhibit One: Weekly work hours for Plaintiff for business week ending September 1, 2006 through May 9, 2008.
 *********** ISSUES
The issues to be determined are:
1. Whether Plaintiff's bilateral upper extremity conditions are compensable occupational diseases?
2. Whether Plaintiff is entitled to any workers' compensation benefits? *Page 4 
3. Whether Plaintiff gave timely notice of her workers' compensation claim?
4. Whether Plaintiff timely filed her workers' compensation claim?
5. Whether Defendants are entitled to a credit for payment of short-term and long-term disability benefits to Plaintiff?
6. Whether Plaintiff is entitled to attorney's fees under § 97-88.1 of the North Carolina General Statutes?
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 51 years old, with a date of birth of April 16, 1959, and is right-hand dominant. Plaintiff has a bachelor of science degree in business administration and training as a massage therapist, barber, and cosmetologist. Prior to October 2002, Plaintiff's work history included hairdressing for approximately 22 years, and then working as a claims adjudicator for the Social Security Administration for approximately 18 months.
2. Plaintiff has a past medical history significant for pain and other complaints in multiple body parts, including her shoulders, elbows, and back. On January 18, 2001, while working as a hairstylist, Plaintiff presented to Dr. David Warner Boone, an orthopaedist, with complaints of left shoulder and elbow pain for quite some time. Dr. Boone diagnosed Plaintiff with left rotator cuff tendonitis as well as left epicondylitis, and recommended conservative treatment, including wearing an elbow strap and physical therapy.
3. On October 22, 2002, Plaintiff began working for Defendant-Employer as a legal assistant. Plaintiff's duties as a legal assistant included performing keyboarding/mousing, *Page 5 
drafting and mailing correspondence, making telephone calls, setting up files and other filing duties, writing, scanning, photocopying, faxing, hole-punching, and ordering medical records. According to Plaintiff, 75 to 80 percent of her work day as a legal assistant for Defendant-Employer consisted of keyboarding, but the keyboarding was not as continuous as that of a transcriptionist. Instead, Plaintiff performed keyboarding between various other duties that she performed throughout the work day. Plaintiff physically handled approximately 30 to 60 files per day that were two to eight inches in thickness and had to be periodically pulled and re-shelved in tightly filled filing cabinets. A description of the numerous tasks Plaintiff performed during her work day is included in transcript documents entitled "Legal Assistant Duties Matrix" and "Guidelines for Legal Assistants" stipulated into evidence by the parties.
4. Plaintiff often worked overtime both at Defendant-Employer's office and by taking work home. Plaintiff did not record all of her overtime hours. Ms. Lila T. Forro, the attorney for whom Plaintiff worked while employed at Defendant-Employer, and Ms. Barbara Jean Maton, who was also a legal assistant for Ms. Forro, corroborated that Plaintiff often worked overtime hours.
5. On February 25, 2003, Plaintiff presented to Dr. William Jason McDaniel, Jr., an orthopaedist, reporting a history of right elbow and forearm pain of approximately three years. Plaintiff also advised Dr. McDaniel that she worked as a right-handed legal assistant, but did not recall any injury or associate any particular cause for her complaints. A physical examination revealed that Plaintiff had pain more in the lateral forearm worsened with activities that used her forearm muscle than in the typical lateral epicondyle area. Plaintiff's x-rays were nomal. Dr. McDaniel was not sure whether Plaintiff had typical lateral epicondylitis, but suspected that *Page 6 
Plaintiff had one of the more unusual forearm nerve entrapment syndromes and recommended evaluation by a hand surgeon.
6. On March 11, 2003, Plaintiff presented to Dr. Joel David Krakauer, an orthopaedist with a sub-specialty in hand surgery, with complaints of her right elbow pain "for two or three years. A physical examination revealed localized pain to the lateral epicondylar region extending down the forearm, and x-rays of the elbow revealed no underlying bony or joint surface abnormalities. Dr. Krakauer diagnosed chronic right lateral epicondylitis.
7. On July 3, 2003, Plaintiff underwent a right lateral epicondylar release with partial ostectomy. Plaintiff continued to see Dr. Krakauer post-operatively, and remained out of work due to the surgery from July 3, 2003 through July 8, 2003. On August 13, 2003, Dr. Krakauer advised Plaintiff to progressively increase her activities. Plaintiff returned to her usual duties as a legal assistant.
8. Plaintiff returned to Dr. Krakauer on March 2, 2004 reporting significant improvement in her right elbow symptoms, but she still had some persistent tightness over the lateral elbow area. Dr. Krakauer administered a cortisone injection. On April 30, 2004, Plaintiff reported to Dr. Krakauer that her pain was almost as bad as before her July 3, 2003 surgery. Dr. Krakauer recommended therapy. Despite the continued pain, Plaintiff was able to continue performing her usual work duties as a legal assistant for Defendant-Employer.
9. On October 26, 2005, Plaintiff presented to Dr. Krakauer with a new complaint of left wrist pain over the dorsal aspect of her wrist when lifting. Plaintiff also reported occasional popping and snapping in her left wrist. Dr. Krakauer felt Plaintiff's left wrist pain was possibly related to extensor tendonitis and recommended resting the wrist and using a wrist splint. Dr. Krakauer also ordered an MRI to rule out a dorsal ganglion versus extensor tenosynovitis. *Page 7 
10. Plaintiff returned to Dr. Krakauer on December 6, 2005. A physical examination revealed more clearly localized pain around the left distal radial ulnar joint deep on the palmar and dorsal side, as well as crooking and rotation. Plaintiff's MRI revealed a triangular fibro-cartilage complex (TFCC) tear and a possible scapholunate ligament tear. Dr. Krakauer recommended left wrist arthroscopy that he felt would likely encompass debridement of the TFCC tear and an examination of the scapholunate ligament.
11. On January 5, 2006, Plaintiff underwent left wrist arthroscopic debridement which showed a left wrist small peripheral TFCC tear and partial lunar triquetral ligament tear. Plaintiff was out of work from January 5, 2006 through January 17, 2006, when she returned to her regular duties as a legal assistant for Defendant-Employer.
12. On March 28, 2006, Plaintiff complained to Dr. Krakauer of numbness and tingling in her left hand which she had been experiencing off and on for approximately a year and a half, aggravated by using her hands in an elevated position. A physical examination revealed involvement of Plaintiff's radial digits, and positive carpal tunnel compression testing. Dr. Krakauer diagnosed carpal tunnel syndrome and administered an injection in Plaintiff's left carpal tunnel.
13. On July 13, 2006, Plaintiff underwent left carpal tunnel release performed by Dr. Krakauer, and was out of work through July 21, 2006. Plaintiff then returned to her regular duties as a legal assistant.
14. On December 5, 2006, Plaintiff presented to Dr. Krakauer with complaints of recurrent left ulnar-sided wrist pain. A physical examination revealed some thickening around the tendon sheath. Dr. Krakauer diagnosed possible tenosynovitis associated with constriction, and administered a cortisone injection. On January 9, 2007, Plaintiff informed Dr. Krakauer that *Page 8 
the cortisone injection resolved her left wrist pain, but she was experiencing left lateral epicondylar pain. Dr. Krakauer administered an injection.
15. On April 10, 2007, Plaintiff returned to Dr. Krakauer with ongoing left upper extremity complaints over the left lateral elbow and over the ulnar side of the wrist. Plaintiff indicated that she wanted to proceed with surgery, and Dr. Krakauer recommended a left lateral epicondylar release and tendon decompression. On April 23, 2007, Plaintiff reported bilateral medial epicondylar pain that had been ongoing for a couple of months.
16. On May 7, 2007, Plaintiff underwent a left lateral epicondylar release with partial ostectomy, left extensor carpi ulnaris decompression, and bilateral medial epicondylar cortisone injections. On May 23, 2007, Plaintiff was doing well and had good elbow and wrist range of motion. Plaintiff was out of work from May 7, 2007 through May 18, 2007, and returned to her regular duties as a legal assistant for Defendant-Employer.
17. On October 3, 2007, Plaintiff reported to Dr. Krakauer that the bilateral medial epicondylar cortisone injections she received at the time of her May 7, 2007 surgery provided relief for about three months. Dr. Krakauer diagnosed bilateral medial epicondylitis refractory to single injections in both elbows and right middle proximal interphalangeal joint strain with secondary swelling and pain with history of prior fracture without underlying arthritis. Dr. Krakauer administered a second set of bilateral medial epicondylar cortisone injections. On October 17, 2007, Dr. Krakauer administered a cortisone injection to Plaintiff's right middle finger.
18. Plaintiff presented to Dr. Krakauer on January 2, 2008 with continued bilateral elbows complaints. Plaintiff denied any numbness or tingling in the ulnar nerve distribution. On January 24, 2008, Plaintiff underwent a right medial epicondylar release with partial ostectomy. *Page 9 
Plaintiff was out of work from January 24, 2008 through January 31, 2008. Although Plaintiff returned to her regular duties as a legal assistant, she continued to have problems with her upper extremities. Defendant-Employer allowed Plaintiff's mother to assist her in performing some of her duties.
19. On April 8, 2008, Plaintiff reported ongoing bilateral elbow pain, greater on the left hand and she was still having persistent joint pain in her right middle finger. Dr. Krakauer administered another injection to Plaintiff's right middle finger and suggested therapy for her ongoing elbow complaints.
20. In early May 2008, Plaintiff had a discussion with her supervising attorney, Ms. Forro, concerning possible options she might have regarding her ongoing upper extremity complaints and her work. Ms. Forro suggested that Plaintiff consider filing a workers' compensation claim. As a result of Plaintiff's conversation with Ms. Forro, she subsequently discussed the relationship between her duties as a legal assistant with Defendant-Employer and her ongoing upper extremity complaints with Dr. Krakauer.
21. On May 9, 2008, Plaintiff presented to Dr. Krakauer with complaints of continued right elbow pain, especially in the medial and lateral aspects. Plaintiff reported that therapy seemed to be aggravating the pain more than helping it. Plaintiff also discussed with Dr. Krakauer the relationship between her duties as a legal assistant for Defendant-Employer and her ongoing upper extremity complaints. At this visit, Dr. Krakauer advised Plaintiff that, in his opinion, her duties as a legal assistant for Defendant-Employer were causing her lateral and medial epicondylitis, left carpal tunnel syndrome, and extensor carpi ulnaris tendonitis. Dr. Krakauer administered another injection, and wrote Plaintiff out of work for three weeks. *Page 10 
22. Ms. Forro estimated that within two weeks of her first conversation with Plaintiff regarding the possibility of filing a workers' compensation claim, Plaintiff returned to her and informed her that after consultation with Dr. Krakauer regarding the relationship between her duties as a legal assistant for Defendant-Employer to her ongoing upper extremity complaints, she intended to file a claim. Plaintiff also informed Defendant-Employer's office manager of her intent to file a workers' compensation claim. Defendants had actual knowledge of Plaintiff's intent to file a workers' compensation claim within 30 days of when she first received notification by a physician that her duties as a legal assistant for Defendant-Employer were causing her lateral and medial epicondylitis, left carpal tunnel syndrome, and extensor carpi ulnaris tendonitis.
23. On May 28, 2008, Plaintiff presented to Dr. Krakauer with complaints of neck and posterior right shoulder pain. Plaintiff also reported that her elbows were doing better since being out of work and having the cortisone injections. Dr. Krakauer suspected a possible trigger point in the periscapular region, recommended a trigger point injection, and continued to keep Plaintiff out of work.
24. At Plaintiff's June 4, 2008 visit to Dr. Krakauer, she reported some relief from the trigger point injection, but continued to have lateral neck, shoulder, and arm pain. Plaintiff's elbow was better on the right side, but continued to be painful on the left side. Dr. Krakauer discussed with Plaintiff undergoing medial epicondylar release surgery and continued to keep her out of work.
25. Plaintiff filed a Form 18 on June 12, 2008 giving written notice of her workers' compensation claim to Defendants. Although not filed within 30 days, the Full Commission finds that Defendants had timely notice of Plaintiff's workers' compensation claim, when she *Page 11 
verbally gave notice of her intent to file a claim. Plaintiff filed her Form 18 approximately 34 days after she was advised by competent medical authority that her duties as a legal assistant for Defendant-Employer were causing many of her left upper extremity conditions and less than 30 days after Defendants had actual notice of her workers' compensation claim. Plaintiff's filing delay was reasonable and such delay in providing written notice did not prejudice Defendants.
26. The Full Commission further finds that Plaintiff's workers' compensation claim is not barred by the applicable filing limitations, as no physician advised Plaintiff that her employment was the cause of her left upper extremity conditions until May 9, 2008, when Dr. Krakauer discussed with Plaintiff that her employment was a likely cause of her lateral and medial epicondylitis, left carpal tunnel syndrome, and extensor carpi ulnaris tendonitis.
27. On July 8, 2008, Plaintiff presented to Dr. Harrison Gray Tuttle, an orthopaedist with a sub-specialty in hand surgery, since Dr. Krakauer moved to another state. Plaintiff continued to complain of left medial-sided elbow pain. Dr. Tuttle diagnosed Plaintiff with left medial epicondylitis, although he noted that her physical examination was not completely consistent with that diagnosis, in that she had no pain with provocative maneuvers. Dr. Tuttle recommended a left upper extremity MRI to help confirm his diagnosis, and continued to keep Plaintiff out of work.
28. Plaintiff continued to seek treatment from Dr. Tuttle for bilateral elbow pain. On July 29, 2008, Dr. Tuttle felt that Plaintiff's symptoms were most consistent with right medial epicondylitis, and he continued to keep Plaintiff out of work.
29. On September 23, 2008, Plaintiff returned to Dr. Tuttle with continued complaints of bilateral medial-sided elbow pain. Plaintiff's most recent right medial epicondylar injection provided excellent relief, and although she reported pain on the medial aspect of the left elbow, it *Page 12 
was not as severe. In addition, Plaintiff reported that her recent neck surgery led to resolution of the lateral-sided elbow pain bilaterally. Because Dr. Tuttle felt that Plaintiff's elbow symptoms were resolving, he instructed her to participate in activities as tolerated, and indicated that when she was able to return to work with respect to her neck problems, she would be at full-duty from the perspective of her arms/elbows. Dr. Tuttle's work note assigned Plaintiff permanent restrictions, including no lifting over five pounds, no grasping, climbing, pushing, pulling, fine manipulation, repetitive motions, keying, or vibrations, and limited her to working only four hours per day, five days per week.
30. At Plaintiff's November 4, 2008 visit, she advised Dr. Tuttle that following her attempt to increase her activity level, she experienced medial elbow and right dorsal forearm pain, as well as numbness in her fingers. A physical examination revealed increased medial elbow and dorsal forearm pain upon provocative maneuvers. Dr. Tuttle felt that Plaintiff's symptoms were consistent with bilateral medial epicondylitis, lateral epicondylitis, and possible radial tunnel syndrome, and that the numbness and tingling in the long and ring fingers could be due to radiculopathy at the C7 level of the spine. Since there was not one particular place Dr. Tuttle felt he could treat to eliminate Plaintiff's symptoms, he was of the opinion that the best option was to modify her activity, to enforce the permanent restrictions he previously issued, and to monitor her clinically. Dr. Tuttle indicated he would be happy to see Plaintiff for consideration of a cortisone injection or another diagnostic test, if her symptoms changed or worsened.
31. On August 4, 2009, Dr. Tuttle was of the opinion that Plaintiff was at maximum medical improvement, but did not release her from his care. Dr. Tuttle is willing to continue to treat Plaintiff. *Page 13 
32. Dr. Krakauer was of the opinion that Plaintiff's duties as a legal assistant for Defendant-Employer, as she described them to him on May 9, 2008, substantially contributed to or worsened her lateral and medial epicondylitis, carpal tunnel syndrome, and extensor carpi ulnaris tendonitis, and that such employment placed her at an increased risk for the development of her lateral and medial epicondylitis, carpal tunnel syndrome, and extensor carpi ulnaris tendonitis over that of the general population. Even though Dr. Krakauer was aware that Plaintiff had problems with her elbows prior to her employment as a legal assistant for Defendant-Employer, and that she worked as a hairdresser for over 20 years, he opined that her lateral and medial epicondylitis, carpal tunnel syndrome, and extensor carpi ulnaris tendonitis "more clearly arose directly" from her duties as a legal assistant. Further, Dr. Krakauer was of the opinion that the exact number of hours that Plaintiff keyboarded or moused is not critical, as long as she had a "substantial exposure" to these activities, which would be 70 to 80 percent of the work day for at least a year or two. The Full Commission gives great weight to the opinion testimony of Dr. Krakauer.
33. Dr. Krakauer was not sure whether Plaintiff's TFCC tear was the ultimate source of her pain. Dr. Krakauer did not know when Plaintiff's TFCC tear developed, or when it occurred. According to Dr. Krakauer, TFCC tears are generally not specifically related to keyboard use, and thus it would be hard for him to relate Plaintiff's duties as a legal assistant with Defendant-Employer to this injury.
34. Dr. Tuttle testified that he had no reason to disagree with Dr. Krakauer's opinion regarding increased risk and causation, and that he based his understanding of Plaintiff's duties as a legal assistant for Defendant-Employer on his review of Dr. Krakauer's treatment of her in his office notes. Dr. Tuttle also opined to a reasonable degree of medical certainty that even if *Page 14 
Plaintiff's previous career as a hairdresser initially caused her epicondylitis, her duties as a legal assistant for Defendant-Employer aggravated this condition if she was typing 75 to 80 percent of the work day as she described. The Full Commission gives great weight to the opinion testimony of Dr. Tuttle.
35. Defendants retained Mr. William T. McClure, Jr., a certified ergonomic evaluation specialist, to perform an ergonomic analysis of a legal assistant position with Defendant-Employer. Mr. McClure has a master's degree in exercise physiology. Because Plaintiff was not available to demonstrate her employment duties as a legal assistant, Mr. McClure requested that Defendants provide an individual of the same gender with comparable physical build that would have a similar work station and similar interface with the work station, including similar typing skills as Plaintiff. In response, Defendants provided Ms. Roberta Hill. Because Mr. McClure did not know Plaintiff's height or weight, he was unable to determine whether Ms. Hill was of comparable physical build to Plaintiff. Mr. McClure also observed other legal assistants employed by Defendant-Employer, but was unaware of how they compared to Plaintiff's physical build and work habits, as well.
36. Mr. McClure was not aware that different attorneys at Defendant-Employer have different work habits and different work requirements and duties for their legal assistants. Ms. Hill worked for a different attorney than the one for whom Plaintiff primarily worked. Mr. McClure observed Ms. Hill perform the duties of legal assistant with Defendant-Employer for over two hours and attempted to take measurements of as many objective factors as he could, such as force exerted, grip/pinch strength and hand posture, etc.
37. Based upon Mr. McClure's observations of Ms. Hill and some other legal assistants working for Defendant-Employer during two visits to Defendant-Employer's office, *Page 15 
including measurements he took while performing the duties of a legal assistant, he opined that Plaintiff's duties as a legal assistant for Defendant-Employer did not create risk factors above an acceptable risk for the development of cumulative trauma disorders of the upper extremity. Mr. McClure based his opinion on his conclusion that there was a lack of forceful exertions of the fingers and hands in a gripping manner, repetitive elements specific to keystrokes and joint movement rates per hour, forceful gripping, pinching, pounding, contact stress, vibration, or environmental factors that would create an increased risk for the development of cumulative trauma disorders of the upper extremity. According to Mr. McClure, he counted the keystrokes of the legal assistants that he observed working for Defendant by observing them type and counting each keystroke with a "clicker." However, Mr. McClure conceded that if Plaintiff's description of her employment duties was credible and accurate, then his opinions would not be accurate, as they would be based upon observations of employment duties inconsistent with those of Plaintiff's. The Full Commission gives little weight to the opinion testimony of Mr. McClure.
38. Both Dr. Krakauer and Dr. Tuttle were skeptical of the opinions of Mr. McClure regarding increased risk. Dr. Krakauer and Dr. Tuttle questioned the validity of ergonomic experts such as Mr. McClure because of their lack of clinical experience actually treating patients with cumulative trauma disorders of the upper extremity and following them for years to observe their outcomes. The Full Commission gives greater weight to the opinion testimony of Dr. Krakauer and Dr. Tuttle over any contrary opinions of Mr. McClure regarding increased risk.
39. The Full Commission finds credible Plaintiff's testimony concerning the time she spent each day keyboarding, the nature and description of her other employment duties as a legal assistant for Defendant-Employer, her attempts to locate suitable employment within her *Page 16 
permanent work restrictions, and her description of the nature and circumstances of her upper extremity complaints.
40. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's employment duties as a legal assistant for Defendant-Employer created an increased risk for contracting lateral and medial epicondylitis, carpal tunnel syndrome, and extensor carpi ulnaris tendonitis over that of the general population. The Full Commission further finds that Plaintiff's employment duties as a legal assistant for Defendant-Employer were significant causative factors in her development and/or aggravation of her lateral and medial epicondylitis, carpal tunnel syndrome, and extensor carpi ulnaris tendonitis that Dr. Krakauer and Dr. Tuttle diagnosed and treated.
41. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff failed to meet her burden of proving that her employment duties as a legal assistant for Defendant-Employer created an increased risk for contracting her TFCC tear, or were significant causative factors in the development and/or aggravation of her TFCC tear.
42. The Full Commission finds, based upon the greater weight of the evidence, that as of August 4, 2009, Plaintiff was at maximum medical improvement with respect to her lateral and medial epicondylitis, carpal tunnel syndrome, and extensor carpi ulnaris tendonitis treated by Dr. Tuttle. The medical treatment Plaintiff received from Dr. Krakauer and Dr. Tuttle with respect to her lateral and medial epicondylitis, carpal tunnel syndrome, and extensor carpi ulnaris tendonitis was reasonably required to effect a cure, to give relief, and/or to lessen her period of disability with respect to her compensable occupational diseases of lateral and medial epicondylitis, carpal tunnel syndrome, and extensor carpi ulnaris tendonitis. The Full Commission further finds that any future treatment recommended by Dr. Tuttle with respect to *Page 17 
her compensable occupational diseases of lateral and medial epicondylitis, carpal tunnel syndrome, and extensor carpi ulnaris tendonitis is reasonably necessary.
43. The Full Commission finds, based upon the greater weight of the evidence, that Dr. Tuttle should be designated as Plaintiff's authorized treating physician.
44. Plaintiff did not return to work for Defendant-Employer after May 9, 2008, when Dr. Krakauer initially took her out of work. When Dr. Tuttle released Plaintiff to return to work with permanent work restrictions on or about September 23, 2008, she contacted Defendant-Employer but they could not accommodate her restrictions and offered her no vocational rehabilitation. Thereafter, Plaintiff made attempts to find suitable employment within her permanent work restrictions through postings with the State of North Carolina, in newspapers, and on internet sites, and she also sought the assistance of the vocational rehabilitation program through the State of North Carolina. None of these efforts to locate suitable employment proved successful, in part, due to the permanent work restrictions that she had.
45. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff proved that she was temporarily and totally disabled from July 3, 2003 through July 8, 2003, when she underwent a right lateral epicondylar release with partial ostectomy; from July 13, 2006 through July 21, 2006, when she underwent a left carpal tunnel release; from May 7, 2007 through May 18, 2007, when she underwent a left lateral epicondylar release with partial ostectomy, left extensor carpi ulnaris decompression, and bilateral medial epicondylar cortisone injections; and from January 24, 2008 through January 31, 2008, when she underwent a right medial epicondylar release with partial ostectomy.
46. The Full Commission further finds that Plaintiff proved that she was temporarily and totally disabled from May 9, 2008 through the present and continuing. On May 9, 2008, Dr. Krakauer *Page 18 
took Plaintiff out of work and kept her out of work until he transferred her care to Dr. Tuttle due to his relocation out of state. Once Dr. Tuttle assumed care of Plaintiff's left upper extremity complaints, he continued to keep her out of work until September 23, 2008, when he released her to return to work four hours per day, five days per week with the following permanent work restrictions: no lifting over five pounds, no grasping, climbing, pushing, pulling, fine manipulation, repetitive motions, keying, or vibrations. Defendant-Employer could not accommodate Plaintiff's permanent work restrictions, and Plaintiff made attempts to find suitable employment within her work restrictions, but was unsuccessful. Given the stringent nature of Plaintiff's permanent work restrictions and her current physical limitations with respect to her upper extremity problems, it would be futile for her to continue to seek suitable employment, despite her education, work history, and relatively young age.
47. On September 9, 2008, Plaintiff began receiving $2,367.04 per month in long-term disability compensation from Defendant-Employer, and continued to receive such disability compensation as of the date of the hearing before the Deputy Commissioner. The total amount of long-term disability compensation that Plaintiff received as of the date of the hearing before the Deputy Commissioner was $18,936.32, and it was entirely employer-funded.
48. The Full Commission finds, based upon the greater weight of the evidence, that Defendants are entitled to a credit for the long-term disability compensation paid to Plaintiff as a result of her compensable occupational diseases.
49. The Full Commission finds, based upon the greater weight of the evidence, that Defendants had reasonable grounds to defend this claim, as the medical evidence was in dispute.
 *********** *Page 19 
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
CONCLUSIONS OF LAW
1. Plaintiff's workers' compensation claim is not barred by the applicable time limitations period for filing a claim for an occupational disease. N.C. Gen. Stat. § 97-58 (2010). The two year time period for filing an occupational disease claim begins running when an employee has suffered injury from an occupational disease which renders the employee incapable of earning the wages the employee was receiving at the time of the incapacity from such injury, and the employee is informed by competent medical authority of the nature and work-related cause of the injury. Dowdy v.Fieldcrest Mills Inc.,308 N.C. 701, 706, 304 S.E.2d 215, 218-219 (1983), rehearingdenied, 311 S.E.2d 590 (N.C. 1984). No physician informed Plaintiff that her employment was the cause of her left upper extremity conditions until Dr. Krakauer informed her on May 9, 2008, that her employment was a likely cause of her lateral and medial epicondylitis, left carpal tunnel syndrome, and extensor carpi ulnaris tendonitis. Plaintiff's filing of her occupational disease claim on June 12, 2008, was within the two year statutory time period. N.C. Gen. Stat. § 97-58 (2010).
2. Plaintiff advised Defendants of her intent to file a workers' compensation claim approximately two weeks after she first received notification from Dr. Krakauer that her duties as a legal assistant for Defendant-Employer were causing her lateral and medial epicondylitis, left carpal tunnel *Page 20 
syndrome, and extensor carpi ulnaris tendonitis. In light of Defendants' actual notice of her intent to file a workers' compensation claim, Plaintiff had reasonable excuse for not filing her Form 18 claim until 34 days after she first learned that her duties as a legal assistant for Defendant-Employer were causing her lateral and medial epicondylitis, left carpal tunnel syndrome, and extensor carpi ulnaris tendonitis. Plaintiff's failure to provide written notice to Defendants within 30 days did not prejudice Defendants. N.C. Gen. Stat. § 97-22 (2010).
3. In Rutledge v. Tultex Corp./King's Yarn, the Supreme Court of North Carolina held that in order for an occupational disease to be compensable under the North Carolina Workers' Compensation Act, a plaintiff must prove that the claimed disease is: "(1) characteristic of persons engaged in the particular trade or occupation in which the [plaintiff] is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the [plaintiff's] employment." Rutledge v. Tultex Corp./King'sYarn, 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). In cases where the employment exposed the worker to a greater risk of contracting the disease than the general public, the first two elements are satisfied. Rutledge, 308 N.C. at 93-94, 301 S.E.2d at 365.
4. Plaintiff established by the greater weight of the evidence that as a result of her employment with Defendant-Employer as a legal assistant, she contracted the occupational diseases of lateral and medial epicondylitis, left carpal tunnel syndrome, and extensor carpi ulnaris tendonitis. N.C. Gen. Stat. § 97-53(13) (2010). The opinion testimony of Dr. Joel David Krakauer and Dr. Harrison Gray Tuttle, which the Full Commission has given great weight, is sufficient to meet Plaintiff's burden of proving that her employment duties placed her at greater risk over that of the general public for contracting lateral and medial epicondylitis, left carpal tunnel syndrome, and extensor carpi ulnaris tendonitis, and that Plaintiff's employment duties, more likely than not, caused or significantly contributed to the development of her lateral and medial epicondylitis, left carpal tunnel syndrome, and extensor carpi ulnaris tendonitis. Rutledge,308 N.C. 85, 301 S.E.2d 359 (1993). *Page 21 
5. Plaintiff failed to meet her burden of proving that her employment duties as a legal assistant for Defendant-Employer created an increased risk for the development of her TFCC tear, or were significant causative factors in the development and/or aggravation of her TFCC tear. N.C. Gen. Stat. § 97-53(13) (2010); Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003); Young v. Hickory BusinessFurniture, 353 N.C. 227, 538 S.E.2d 912 (2000).
6. As of August 4, 2009, Plaintiff was at maximum medical improvement. The medical treatment Plaintiff received with respect to her lateral and medial epicondylitis, carpal tunnel syndrome, and extensor carpi ulnaris tendonitis was reasonably necessary to effect a cure, to give relief, and/or to lessen her period of disability, and Defendants are obligated to pay for such treatment. Plaintiff needs continuing medical treatment. Dr. Tuttle is hereby designated as Plaintiff's authorized treating physician. N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-25.1 (2010).
7. Plaintiff proved that she was medically disabled from July 3, 2003 through July 8, 2003, when she underwent a right lateral epicondylar release with partial ostectomy; from July 13, 2006 through July 21, 2006, when she underwent a left carpal tunnel release; from May 7, 2007 through May 18, 2007, when she underwent a left lateral epicondylar release with partial ostectomy, left extensor carpi ulnaris decompression, and bilateral medial epicondylar cortisone injections; and from January 24, 2008 through January 31, 2008, when she underwent a right medial epicondylar release with partial ostectomy. Therefore, Plaintiff is entitled to temporary total disability compensation in the amount of $698.72 per week from July 3, 2003 through July 8, 2003, from July 13, 2006 through July 21, 2006, from May 7, 2007 through May 18, 2007, and from January 24, 2008 through January 31, 2008. N.C. Gen. Stat. § 97-29 (2010); Russell v. Lowes Prod.Distrib., 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993). *Page 22 
8. Plaintiff proved that she was temporarily and totally disabled from May 9, 2008 through the present and continuing. Dr. Krakauer and Dr. Tuttle kept Plaintiff out of work from May 9, 2008 through September 23, 2008, when Dr. Tuttle released her to return to work four hours per day, five days per week with permanent work restrictions. Defendant-Employer could not accommodate Plaintiff's permanent work restrictions, and Plaintiff made reasonable attempts to find suitable employment within her work restrictions, but was unsuccessful. Given the stringent nature of Plaintiff's permanent work restrictions and her current physical limitations with respect to her upper extremity condition, it would be futile for her to continue to seek suitable employment, despite her education, work history, and relatively young age. Therefore, Plaintiff is entitled to temporary total disability compensation in the amount of $698.72 per week from May 9, 2008 through the present and continuing. N.C. Gen. Stat. § 97-29 (2010); Russell v. Lowes Prod.Distrib., 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
9. Defendants are entitled to a credit for the long-term disability compensation paid to Plaintiff as a result of her compensable occupational diseases of lateral and medial epicondylitis, carpal tunnel syndrome, and extensor carpi ulnaris tendonitis. N.C. Gen. Stat. § 97-42 (2010).
10. Defendants had reasonable grounds to defend this claim, as the medical evidence was in dispute. N.C. Gen. Stat. § 97-88.1 (2010).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD *Page 23 
1. Subject to a reasonable attorney's fee herein approved, Defendants shall pay temporary total disability compensation to Plaintiff at the rate of $698.72 per week from July 3, 2003 through July 8, 2003, from July 13, 2006 through July 21, 2006, from May 7, 2007 through May 18, 2007, from January 24, 2008 through January 31, 2008, and from May 9, 2008 through the present and continuing, until further Order of the North Carolina Industrial Commission. Any accrued compensation shall be paid in a lump sum.
2. Defendants shall pay all medical expenses incurred or to be incurred as a result of Plaintiff's compensable occupational diseases of lateral and medial epicondylitis, carpal tunnel syndrome, and extensor carpi ulnaris tendonitis for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen her period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act.
3. A reasonable attorney's fee of 25 percent of the compensation due Plaintiff under paragraph one is approved for Plaintiff's counsel, to be deducted and paid directly to Plaintiff's counsel from the accrued compensation due Plaintiff and thereafter by deducting every fourth compensation check due Plaintiff.
4. Plaintiff's request for attorney's fees under § 97-88.1 of the North Carolina General Statutes is denied.
5. Defendants shall pay the costs of these proceedings.
This the ___ day of February 2011.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER *Page 24 
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER *Page 1